UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at LEXINGTON

CIVIL ACTION NO. 5:12-cv-335-KKC

BIRCHWOOD CONSERVANCY d/b/a
WORLD HERITAGE ANIMAL GENETIC
REPOSITORY INSTITUTE,                                                              PLAINTIFF,

V                                   **OPINION & ORDER**

JEREMY WEBB, et al.,                                                               DEFENDANTS.

\* \* \* \* \* \* \* \* \* \*

This matter is before the Court on the motion for summary judgment filed by Defendants Sheriff Tony Hampton and Deputy Sheriff Ben Jones (DE 130) and the motion for summary judgment filed by Defendant Jeremy Webb (DE 172).

The plaintiff asserts constitutional claims against Sheriff Hampton and Deputy Jones, arguing that its constitutional rights when a neighbor shot two of its goats. A threshold issue on the constitutional claims is whether the deputy can be held liable for the acts of the neighbor. Because Deputy Jones did not assist in, coerce or significantly encourage the goat shooting, neither he nor Sheriff Hampton may be held liable for any constitutional violation.

The plaintiff asserts state-law claims against its neighbor, Jeremy Webb, who shot the goats. The critical issue for that claim is whether the plaintiff can prove any damages that it suffered as a result of the shooting. Because the plaintiff concedes it cannot prove the only damages alleged in its complaint and the Court has ruled that it may not now allege other kinds of damages, the plaintiff's claims against Webb must be dismissed.

I.   Background

In its complaint, Birchwood states that it operates a non-profit research facility in Georgetown, Kentucky (DE 1). According to Birchwood, its facility is used for research in Animal Genetic Resource Biodiversity and it works with the United Nations Food and Agriculture Organization, the United Nations Environmental Programme, and Convention on Biological Diversity to aid developing nations and women farmer stakeholders build capacity through sustainable agriculture.

Birchwood alleges that on November 8, 2011, a herd of experimental goats escaped Birchwood's facility through a breach in the fence line and wandered onto Defendant Jeremy Webb's neighboring farm. Webb then called the Scott County Sheriff's Department and complained that his neighbor's goats had entered his property. Defendant Deputy Ben Jones responded to the call and arrived at Webb's property.

Jones confirmed that there were approximately 30 goats on Webb's property and, according to Birchwood, discussed with Webb "the legal issues of exterminating a couple of the goats as a deterrent to future instances of letting their animals run at large." Birchwood then alleges that, as Deputy Jones was leaving the farm, he heard gunshots. Upon returning to Webb, Deputy Jones discovered that Webb had shot and killed two of the goats. Webb does not deny that he shot the goats.

According to Birchwood, these two goats were no ordinary goats. Rather, Birchwood alleges that the two goats killed by Webb were rare hybrid goats which were participants in the World Heritage Animal Genetic Repository global conservation initiative in collaboration with the United Nations Food and Agriculture Organization, Interlaken Declaration Global Plan of Action for Animal Genetic Resource Conservation.

Birchwood asserts claims against three defendants: Webb, Deputy Jones, and Sheriff Tony Hampton, who is the Sheriff of Scott County, Kentucky. As to Webb, Birchwood asserts state-law claims for breach of "a duty to refrain from inflicting wanton or willful injury" on the goats and a claim for conversion.

As to Deputy Jones, Birchwood asserts a constitutional claim under 42 U.S.C. § 1983, alleging that Deputy Jones either gave his approval or encouraged Webb to shoot the goats and that, in doing so, violated Birchwood's Fourth Amendment and due process rights.

As to Sheriff Hampton, Birchwood asserts that he is liable for Deputy Jones' constitutional violation under KRS § 70.040, a state statute providing that "[t]he sheriff shall be liable for the acts or omissions of his deputies; except that, the office of sheriff, and not the individual holder thereof, shall be liable under this section." KRS § 70.040. The Court has construed the complaint to assert claims made against Sheriff Hampton only in his official capacity as the Scott County Sheriff and not in his individual capacity. (DE 194, Opinion at 6.)

## II. Analysis

### A. Constitutional claims

Birchwood asserts constitutional claims under 42 U.S.C. § 1983 against Jones. Section 1983 provides a cause of action against any person who, while acting "under color" of state law, deprives an individual of federally guaranteed rights. 42 U.S.C. § 1983. There is no question Jones was acting under color of state law when he arrived at Webb's property on the date that Webb shot the goats. The issue is whether Jones did anything that deprived Birchwood of its constitutional rights.

Birchwood alleges that its constitutional rights were violated by the goat shooting. Again, Jones did not shoot the goats. Birchwood's neighbor, Webb – a private citizen – shot the goats. Governmental actors "normally can be held responsible for a private decision only when [they have] exercised coercive power or [have] provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Hensley v. Gassman*, 693 F.3d 681, 688 (6th Cir. 2012) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Id.*

Thus, the issue is whether Jones coerced Webb into shooting the goats or provided such significant encouragement to Webb that Jones should be deemed to have actually committed the act.

From 2004 until the date that Webb shot the goats, Webb called the Scott County Sheriff's Department multiple times to report that Birchwood's goats had entered his property and were causing damage (DE 130-1, Mem. at 4; DE 130-2, Jones Aff., ¶ 5; DE 130-6, Incident Reports.) But no party has pointed to any evidence that Deputy Jones and Webb had any interaction other than on the evening that the goats were shot.

Jones states that on that date he was called to Webb's farm "for the purpose of investigating a report that animals were running at large." (DE 130-2, Jones Aff., ¶ 1.) He states that arrived at the farm at about 8:15 p.m. Jones states that he went to the back of the farm with Webb's wife and three children in Webb's Suburban because his cruiser could not negotiate the road to the rear of the farm. (DE 130-1, Mem. at 7.)

Jones states that when he arrived at the back of the farm, Webb informed him that approximately 30 goats had entered his property from the Birchwood farm and that they were destroying Webb's property. (DE 130-2, Jones Aff., ¶ 2.) In the incident report, Jones states that he attempted to contact the residents of the Birchwood farm – Evan Blakeny and Lucinda Christian – by phone but was not able to reach them. He states that he also went to the residence but was unable to make contact with anyone. (DE 130-7, Incident Report.) Blakeny and Christian also serve on the Birchwood Board of Directors. (DE 148, Response at 2.)

Jones states in his affidavit that he returned to his cruiser and that Webb called him to report "an incident at the rear of the farm." (DE 130-2, Jones Aff., ¶ 4.) In his incident report, Jones states that, while driving back to the rear of the farm, he heard three gun shots. (DE 130-7, Incident Report.) He states that Webb told him he shot one goat with one round and the other goat with two rounds. (DE 130-7, Incident Report.)

As to any conversation that occurred between Jones and Webb prior to Webb shooting the goats, Jones states in an affidavit that Webb asked Jones "what his legal rights were with respect to any action that Webb could take against the intruding goats." (DE 130-2, Jones Aff., ¶ 3.) This is also consistent with Webb's deposition testimony.[1] Webb testified that he asked Jones "if I was within my rights to exterminate the goats because they were destroying my property." (DE 130-1, Mem. at 8; DE 186-Webb Dep. at 57-58.)

---

[1] All portions of the deposition testimony cited by the parties have not been filed in the record. Nevertheless, both parties quote verbatim relevant portions of the depositions with no objections. Accordingly, for purposes of this motion, the Court has relied on the party's characterizations of the relevant content of the depositions. No party disputes any portions of the depositions that the Court has relied on for this opinion.

5

Jones states in his affidavit that, in response to Webb's question, Jones informed Webb that he "could take reasonable measures to protect his property." (DE 130-2, Jones Aff., ¶ 3.) But Jones states that he also told Webb he would contact the Scott County Attorney's office to inquire further as to Webb's rights. (DE 130-2, Jones Aff., ¶ 3.)

Webb testified that Jones responded that "as far as [Jones] knew, [Webb] was well within [his] rights to destroy the animals if they were destroying [Webb's] property." (DE 130-1, Mem. at 8; DE 186-2, Webb Dep. at 58.) But Webb also testified that he did not know Jones' exact words. Webb testified that it was his understanding "that I was well within my rights, as the county attorney had told me and the assistant county attorney." (DE 130-1, Mem. at 8; DE 186-2, Webb Dep. at 58.) Webb stated that, based on earlier conversations with the county attorney's office, he was "fairly certain" that he could shoot the goats if they were destroying his property. (DE 130-1, Mem. at 8; DE 186-2, Webb Dep. at 58.) Webb testified that no one specifically told him to "shoot the goats." (DE 178-1, Mem. at 4.) He testified that he told Jones before he shot the goats that he was considering shooting the goats because of "the lack of resolutions with the – the court systems and through civil court." (DE 178-1, Mem. at 5.)

In his deposition, Jones testified that Webb asked him what he could do about the goats because they were "eating on his trees" and that Jones told Webb "he had the right to protect his property from being damaged or destroyed." (DE 130-1, Mem. at 10.) He stated that he then told Webb "let me see what I could do with speaking with the county attorney." Jones testified that he further cautioned that, "because it wasn't the goats' fault," shooting the goats "probably wasn't the best option at that time." (DE 130-1, Mem. at 10.)

6

For purposes of this motion, the Court will assume that, before returning to his cruiser, Jones told Webb he had a right to shoot the goats if they were damaging Webb's property. This is the version of events most favorable to Birchwood. The issue remains as to whether informing Webb he could shoot the goats amounts to coercion or such significant encouragement that Jones himself should be deemed to be the actor.

In *Hensley v. Gassman*, 693 F.3d 681 (6th Cir. 2012), the Sixth Circuit looked at whether the repossession of an automobile by a private party could be attributed to two deputy sheriffs, transforming the repossession into an unreasonable seizure. The court began by noting that the deputies' presence during the repossession solely to keep the peace was "alone insufficient to convert the repossession into state action." *Id.* at 689. But the court explained that "the likelihood that state action will be found increases when officers take a more active role in the possession." *Id.* "At some point, as police involvement becomes increasingly important, repossession by private individuals assumes the character of state action." *Id.* (quoting *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir.1983)). State action may be found where the officer's "affirmative intervention, aid, intimidation, or other use of power. . . converts him from a neutral third party to, in effect, an assistant of the" private party. *Id.* (quoting *Mitchell v. Gieda*, 215 F. App'x 163, 165 (3d Cir.2007)).

The *Hensley* court noted that an officers' conduct can facilitate a private party's action in various ways, "such as through active intervention and assistance." *Id.* In addition, "an officer's conduct can facilitate a repossession if it chills the plaintiff's right to object." *Id.* "A police officers' arrival and close association with the creditor during the repossession may signal to the debtor that the weight of the state is behind the repossession and that the debtor should not interfere by objecting." *Id.* at 690.

In *Hensley* the Court found that the repossession constituted state action but the deputies in that case "eventually broke the vehicle's window and physically extracted the possessor so that [the repo-man] could tow the vehicle away." *Id*. at 684. The court concluded this conduct "was not only active participation, but was instrumental to [the repo-man's] success." *Id*. at 692.

Here, it is undisputed that Deputy Jones was not even present when Webb shot the goats. Nor is it alleged that Deputy Jones had any direct involvement with shooting the goats. He was not called to the scene to assist specifically in shooting the goats. Instead, he was at the scene in response to Webb's complaint that the goats were on his property. Further, Deputy Jones had no interaction at all with Blakeny or Christian while at the scene. None of the three was present when Webb shot the goats. Christian testified that she could not remember ever speaking with Jones prior to the evening that Webb killed the goats. (DE 130-1, Mem. at 10.) She was not aware that Jones had been to Webb's farm earlier in the evening. She knew only that he showed up after Webb shot the goats. (DE 130-1, Mem. at 10.) Thus, a jury could not find that Deputy Jones assisted in the shooting of the goats by intimidating Blakeny or Christian.

Because there is no evidence that Jones assisted in, significantly encouraged, or coerced the shooting of the goats, the constitutional claims against him under 42 U.S.C. § 1983 must be dismissed.

As to the § 1983 claim against Sheriff Hampton in his official capacity, it must also be dismissed. With regard to a § 1983 claim, "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthew v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). "Before a local government can be held liable for injuries

under section 1983, . . . a plaintiff must show that his injuries were the result of some 'policy or custom' attributable to the governmental entity." *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir.1989) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). Birchwood does not ever allege that the sheriff's office or county government had a custom or policy that caused the shooting of the goats.

Birchwood asserts that the sheriff's office is liable under KRS § 70.040, which provides that the office is liable for its deputy's acts. Even if that statute were applicable to a federal claim, the sheriff's office is not liable here because Deputy Jones is not liable for the shooting of the goats.

For these reasons, Birchwood's federal claims must be dismissed.

**B. State law claims**

Remaining are Birchwood's state-law claims against Webb. In its complaint, Birchwood alleged that the replacement value of each goat is $95,000. (DE 1, Complaint, § 14.) That figure was based on the cost to clone the goats. But Birchwood now concedes that it can offer no evidence to support the cost of cloning the goats. In a motion to amend its complaint, Birchwood stated that, in the prior two months, animal geneticists had informed it that cloning was not possible. (DE 147, Motion at 4.) Accordingly, Birchwood can produce no evidence regarding the costs of cloning.

In the motion to amend the complaint, Birchwood requested that it be permitted to redact the $95,000-per-goat damages allegation from the complaint and instead seek the costs of restarting the program. In support of the motion, Birchwood cited a report of its expert Dr. Mike Reed. In his report, Dr. Reed explained that the two goats that were killed were "the only two breeding males" from the project and were the result of an 8-year

9

breeding program aimed at producing two new goat breeds. (DE 134-4, Reed Report at 2.) Dr. Reed stated that the loss of the two goats would force Birchwood to "begin the entire breeding program from its beginning." He estimated that the costs to restart the program would be $1,740,771. Dr. Reed further opined that Birchwood would be required to relocate the program from the Scott County property at a cost of $ 284,800 for a total cost to restart the program of $2,330,800.

Dr. Reed stated that the goat-breeding project "would have provided genetic materials to groups throughout the world that could use the genetics to improve herd productivity." Dr. Reed estimated that, "[i]f the result of this project would have increased goat milk production by 0.5% in Africa the lost benefits from the death of the two goats would be $6.5 million per year for at least eight years (when the restarted program is completed and improved goat genetics are available." Dr. Reed opined that the productivity losses in Africa would total $ 52 million, which he discounted to $42.79 million. He opined that the total loss to Birchwood was $44.81 million.

The Court ruled that it was simply too late for Birchwood to amend its damages claim so drastically. The complaint in this matter was filed on November 5, 2012. The motion to amend was filed May 29, 2014, which was more than a year after the April 18, 2013 deadline to amend pleadings contained in the Court's scheduling order (DE 14). In its motion to amend, Birchwood had not explained why it had taken more than 18 months after the filing of the initial complaint to determine that cloning the goats was not actually possible. (DE 194, Opinion.) The Court ruled that Birchwood could not amend its pleadings at that stage of the litigation. Accordingly, Birchwood cannot present evidence to the jury

regarding the costs of restarting the program or the $42.8 million in "lost benefits" discussed in Dr. Reed's opinion.

Birchwood has pointed to no other evidence of damages it would present at a trial of this matter.[2] For this reason, its claims against Webb must be dismissed.

That leaves the petition for declaratory judgment filed by the intervening plaintiff Kentucky Farm Bureau Mutual Insurance Company, which issued a farm owners insurance policy to Webb. Kentucky Farm asks for a declaration that the policy does not cover Webb's intentional shooting of the goats. (DE 69, Petition for Declaratory Judgment.) The Court does not have subject matter jurisdiction over this claim. The Court can adjudicate an intervening claim after dismissal of the underlying claim if the Court has subject matter jurisdiction over it that is independent from its jurisdiction over the underlying claim. *Kelly v. Carr*, 691 F.2d 800, 806 (6th Cir. 1980; *Horn v. Eltra Corp.*, 686 F.2d 439, 440 (6th Cir. 1982) (stating that a "prerequisite of an intervention (which is an ancillary proceeding in an already instituted suit) is an existing suit within the Court's jurisdiction" but that "intervenors with an independent basis for jurisdiction may be treated as stating a wholly separate claim.")

It is clear from the face of the complaint that no such jurisdiction exists over Kentucky Farm's claim against Webb. The claim raises no federal question and Kentucky Farm and Webb are both Kentucky citizens. Thus, diversity jurisdiction does not exist.

---

[2] In fact, Webb has offered the only admissible evidence of damages in this case. That evidence consists of the Kentucky Department of Agriculture's Livestock and Grain Market Report which indicates the average fair market value of goats sold in Kentucky is less than $300. (DE 172-5, Report; DE 172-1, Mem. at 9.)

### III. Conclusion

For all these reasons, the Court hereby ORDERS as follows:

1) the motion for summary judgment filed by Defendants Sheriff Tony Hampton and Deputy Sheriff Ben Jones (DE 130) is GRANTED;

2) Birchwood's claims against Defendants Hampton and Jones are DISMISSED with prejudice;

3) the motion for summary judgment filed by Defendant Jeremy Webb (DE 172) is GRANTED;

4) Birchwood's claims against Defendant Jeremy Webb are DISMISSED with prejudice;

5) Kentucky Farm Bureau's claims against Webb are DISMISSED without prejudice for lack of subject matter jurisdiction;

6) all pending motions are DENIED as moot; and

7) this matter is DISMISSED and STRICKEN from the Court's active docket.

Dated December 4, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY